BECKY THOMAS,

               **Plaintiff,**

-vs-                             **Case No. 6:07-cv-1983-Orl-28GJK**

HARTFORD FIRE INSURANCE
COMPANY,

               **Defendant.**
_____

# ORDER

Plaintiff, Becky Thomas, brings the instant action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., against Defendant, Hartford Fire Insurance Company ("Hartford").[1]  Plaintiff contends that Hartford erroneously

_____

[1]Plaintiff initially brought this suit against Hartford Life and Accident Insurance Company ("Hartford Life"), asserting that she was formerly employed by Hartford Fire Insurance Company but that Hartford Life was "the Plan Administrator of the Plan and/or . . . the fiduciary charged with making benefit determinations under the Plan, including the determinations made on Plaintiff's claim." (See Doc. 1 ¶¶ 5, 8).  A few months into the case, however, Hartford Life moved to dismiss on the basis that Hartford Fire—not Hartford Life—was the sponsor of the benefit plan at issue.  (Mot. to Dismiss, Doc. 15).  Plaintiff then filed an Unopposed Motion to Amend Complaint to name Hartford Fire as the correct defendant.  (Doc. 16).  That motion was granted (Doc. 18), and Plaintiff filed her First Amended Complaint (Doc. 17) naming Hartford Fire as the Defendant.

In its Answer to the First Amended Complaint, Hartford Fire "admits that it is the Plan Administrator of the Plan; admits that it is the claim fiduciary charged with making benefit determinations under the Plan; and admits that it made the decision as to Plaintiff's claim for benefits under the Plan."  (Doc. 27 ¶ 8).  Curiously, however, in her summary judgment filings Plaintiff has reverted to referring to Hartford Life as the Defendant—both in the case caption and in the body of her filings—and again alleges that Hartford Life, not Hartford Fire, is the fiduciary.  (See, e.g., Doc. 35 at 1-2; see also Doc. 37 (referring to Hartford Fire's motion for summary judgment as Hartford Life's motion for summary judgment)).  In light of

terminated her long-term disability ("LTD") benefits. Hartford, however, maintains that its decision to terminate Plaintiff's benefits was neither incorrect nor arbitrary and capricious.

This case is currently before the Court on the parties' cross-motions for summary judgment.[2] Having considered the record, oral argument on the motions (see Mins., Doc. 51), and pertinent law, the Court concludes that Plaintiff's motion must be granted and Hartford's motion must be denied.

## I. Background

Plaintiff began her employment with Hartford in 1998, and she participated in an employee benefit plan, The Hartford Employee Group Benefits Income Protection Plan ("the Plan"), which included disability coverage. (See Plan, H1-H26[3]). Hartford was both the "Plan Administrator" and the "Plan Sponsor." (H21).

It is undisputed that beginning at least as early as 2004, Plaintiff has suffered from several injuries and ailments and has undergone several surgeries. In May 2004, she tore

_____

Plaintiff's amendment of her Complaint to correct the name of the Defendant and in view of Hartford Fire's admissions that it is the Plan Administrator and fiduciary, the Court assumes that these later references by Plaintiff to Hartford Life are in error and that the proper Defendant remains Hartford Fire. The Court refers in the text only to "Hartford" for ease of discussion.

[2]The pertinent filings are: Defendant, Hartford Fire Insurance Company's, Dispositive Motion for Summary Judgment (Doc. 33); Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. 37); Defendant's Court-Authorized Reply Memorandum in Support of Its Motion for Summary Judgment (Doc. 45); Plaintiff's Dispositive Motion for Summary Judgment (Doc. 35); and Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 44).

[3]Hartford has submitted the 649-page administrative record. (Attach. to Doc. 34). References to that record are denoted, in accordance with the numbering system employed therein, by "H" followed by the page number.

her hamstring while waterskiing. In March 2005, she underwent arthroscopic surgery on her knee and was approved for short-term disability ("STD") benefits effective March 17, 2005. She returned to her position as an STD claims examiner for Hartford on April 4, 2005 but stopped full-time work just eleven days later due to hip, hamstring, and knee pain. (H89). Plaintiff then underwent surgery for an ovarian cyst in May 2005, and after that surgery there were complications that kept her out of work. (H562). Plaintiff also experienced back pain around that time, and her doctor requested that she be provided a sit/stand workstation before she attempted to return to work. (H561). She returned to work full time with the sit/stand workstation on August 8, 2005, but she stopped working on August 17, 2005 when her doctor restricted her work to four hours per day and referred her to an orthopedic surgeon. (H546; H89).

Plaintiff received STD benefits for the maximum allowable period—through October 6, 2005. (See H508-09). On October 5, 2005, Hartford informed Plaintiff that she had been approved for LTD benefits effective October 7, 2005. (H513-14). Under the Plan, LTD benefits are payable during the first twenty-four months of a period of disability if an employee is prevented by sickness or accidental bodily injury "from performing one or more of the Essential Duties of [his or her] occupation" during that time period. (H9).[4] Essential duties are defined as those that are "substantial, not incidental"; that are "fundamental or inherent to the occupation"; and that "can not be reasonably omitted or changed." (Id.). Additionally, "[t]o be at work for the number of hours in your office or location standard

---

[4]After the first twenty-four months, LTD benefits are payable only if the employee is "prevented from performing one or more of the Essential Duties of Any Occupation." (H9).

-3-

workweek" is defined by the Plan as an essential duty.  (Id.).

Plaintiff underwent back surgery on November 16, 2005, with recovery expected to take eight to twelve weeks.  (H69).  However, as of late February 2006, her surgeon, Dr. Beckner, reported that Plaintiff could not sit for more than five to ten minutes and that he was not releasing her to work in any capacity at that time.  (H64).  At an office visit with Dr. Beckner on March 13, 2006, Plaintiff reported that about a week earlier she had fallen back after tripping while descending some stairs and had some resulting pain in her neck and shoulder.  (H189).  On March 14, 2006, Plaintiff advised Hartford that Dr. Beckner had released her to work four hours per day as of April 3; then six hours per day for two weeks, then full-time effective May 1.  (H61-62).

Plaintiff resumed work by attending a training class for three to four hours per day starting March 21.  (H61).  On April 24, 2006, Plaintiff saw Dr. Beckner to follow up regarding her neck pain.  (H194).  At that visit, Dr. Beckner noted that an MRI conducted on April 13 showed abnormalities including a disc protrusion to the right at C3-4 as well as disc protrusions to the left at C5-6 and C6-7.  (Id.).  Dr. Beckner also noted that Plaintiff had "returned to work but the stress of work seems to bother her and make her neck hurt more." (Id.; see also H192-93 (report of 04/13/06 MRI)).  Dr. Beckner's impression was that Plaintiff had "[m]ultilevel disc degeneration," and epidural injections were the desired treatment for it.  (H194).  He concluded his April 24 office visit note by stating:   "I will see her back after the injections.  In the meantime, she will cut back on her work hours.  I think that it would be appropriate for her to just work 6-7 hours a day as she seems to be able to tolerate this a little bit better."  (Id.).  Accordingly, Dr. Beckner revised Plaintiff's return-to-work schedule to

6.5 hours per day until further notice.  (H195; <u>see also</u> H58-59).

During the five workdays of the week of April 24, Plaintiff worked 6.5 hours, 7.0 hours, 7.5 hours, 6.5 hours, and 7.0 hours, respectively, (H57), and in subsequent weeks she also sometimes worked seven or more hours in a day, (<u>see, e.g.</u>, H51-52).  When Hartford spoke to Plaintiff on May 18, 2006 about the hours she was working, Plaintiff acknowledged her 6.5-hour restriction but reported that she was still expected to get a full caseload done and had to work extra to stay caught up.  (H55).  Plaintiff also reported that when she "pushed herself  to work longer hours due to . . . being overwhelmed and needing to get work done, she has had to [take] a day off due to the amount of pain she is in."  (<u>Id.</u>).

On May 30, 2006, Plaintiff reported to Hartford that she had seen a rheumatologist and had been diagnosed with rheumatoid arthritis.  (H54).  However, the rheumatologist had not given Plaintiff restrictions or limitations regarding work.  (<u>Id.</u>).  On June 7, 2006, Hartford sent a letter to Plaintiff's surgeon, Dr. Beckner, advising him that although Plaintiff had been restricted to only 6.5 hours per day, she actually had been working more than that; Hartford provided Beckner with a day-by-day report of how many hours she had worked—many in excess of 6.5—and then asked him if Plaintiff could work forty hours per week.  (H51-52).  On June 8, 2006, Dr. Beckner responded by indicating that Plaintiff could return to work full time, forty hours per week, without noting any restrictions or limitations.  (H51).  Dr. Beckner's office notes indicate on June 8, 2006:  "I received a note from . . . Hartford Insurance requesting work hours for [Plaintiff].  I had given her a 6 1/2 hour day but according to the records sent to me, she has worked anywhere from 6 1/2 to 9 1/2 hours a day.  Therefore, I think that it is quite permissible for her to work an 8 hour day at this time."

(H196).

After receiving this information from Dr. Beckner, Hartford called Plaintiff and left her a message that she had been released to return to work full-time and that her disability claim would be closing. (H50).[5] Plaintiff called Hartford on June 16, 2006, to report that she had not seen Dr. Beckner in a while but had an appointment scheduled with him for June 19. (H49). Plaintiff stated on that date that she was unable to work forty hours per week and that the only reason she worked more than 6.5 hours per day was because she was expected to handle a full case load. (Id.).

At the June 19, 2006 office visit, Dr. Beckner noted that Plaintiff had pain and diminished motion in her neck and that he would "send her for injections in the neck to see if these may help her." (H197). Dr. Beckner wrote a note at that time stating that Plaintiff was to avoid sitting longer than four to six hours per workday. (H198; see also H48). Plaintiff advised Hartford after that visit that Dr. Beckner would fax a form regarding continued disability in seven to ten days. (H48).

On June 27, 2006, Hartford sent an email to Plaintiff's boss, Doug Woulf, indicating that Hartford had received updated restrictions and limitations for Plaintiff—avoid sitting longer than four to six hours per workday, avoid repetitive lifting and bending, and no lifting over twenty pounds—and inquired whether he could accommodate those restrictions. (H419). Woulf responded that same day: "The last two [restrictions] are moot, as not part of her job. [Plaintiff] does have the special desk that enables her to work while either sitting

_____

[5]Plaintiff's LTD benefits were not, however, terminated at that time.

or standing as needed. She does use the desk's functionality by working while standing part of each day, and then sits most of the day. She can and does sit or stand as she deems needed." (Id.; see also H45-46).

Woulf sent another response to Hartford on July 11, 2006, stating:

> [Plaintiff] is an STD examiner and has a desk job, similar in function to yours and mine. Several months ago she was provided an adjustable desk that raises up and down. Her job duties involve no repetitive lifting and bending, and there is no lifting over 20 pounds. She could avoid the 'sitting longer than 4-6 hours per workday' by standing at her workstation periodically—and she does. Based on what is below, there is seemingly nothing for us to accommodate, as [Plaintiff] can control her sitting/standing to avoid exceeding the maximum of 6 hours of sitting.

(H414). Ten days later, on July 21, 2006, Woulf called Hartford and stated that Plaintiff had called in sick the prior three days; that she had serious cervical issues; that the rheumatoid medications were making her sick; that after 3:00 p.m. she could not hold her head up; and that he did not think she could consistently work eight hours per day in her current job. (H41-42).

On July 14, 2006, Hartford sent a fax to Dr. Beckner's office, advising that Plaintiff had been provided with a sit/stand desk and seeking clarification as to whether Plaintiff could work for eight hours per day with that accommodation. (H201). Dr. Beckner's response, dated July 17, 2006, was received by Hartford on July 24, 2006; it indicated that Plaintiff was released to work full-time, eight hours per day, using a sit/stand workstation with the restrictions that he had indicated on June 19, 2006. (H40; H201-02; see also H203 (Beckner note dated July 17, 2006 stating that he thinks that with the sit-stand work station, "it would

be fine for her to return to a job 8 hours a day")).[6]  Hartford called Plaintiff on July 25, 2006 and advised her that Dr. Beckner had released her to work eight hours per day using the sit/stand workstation.  (H39).  In a letter dated that same day, Hartford informed Plaintiff that her LTD benefits were not payable beyond July 16, 2006 because she did not meet the definition of Disability in the Plan beyond that date, and Plaintiff was advised of her right to appeal within 180 days.  (H143-46).

After her LTD benefits were terminated, Plaintiff continued to see doctors and to submit documentation to Hartford.  On June 30 and July 18, 2006, Plaintiff had received epidural steroid injections to treat her neck pain,[7] (H199-200; H206-07), and at an office visit on July 27, Dr. Beckner noted that these injections had helped with numbness and tingling but not with Plaintiff's neck pain.  (H208).  During that visit, Dr. Beckner and Plaintiff discussed surgery.  (H209).

---

[6]Upon receiving Hartford's July 14, 2006 fax, Dr. Beckner noted that "[a]pparently, her employer has provided her with a sit-stand work station and a movable desk," seemingly thinking that the provision of the sit/stand desk was a recent change.  (H203).  Hartford's Summary Detail Report of Plaintiff's file similarly states:  "Dr. Beckner was not aware that [Plaintiff] had a sit/stand workstation, and when told this, agreed that she is capable of full-time work."  (H40).  However, the sit/stand workstation had been provided nearly a year earlier—in August 2005—and had been mentioned by Dr. Beckner in his reports to Hartford in February 2006.  (See H63-64).  Apparently Dr. Beckner had forgotten about the sit/stand desk until Hartford mentioned it in the July 14 fax.

Plaintiff's attorney also seems to be mistaken about the date the sit/stand desk was provided.  He refers to it having been provided in July 2006 rather than in August 2005.  (See Doc. 35 at 10 (referring to August 8, 2006 as "a mere three weeks after [the sit/stand desk] accommodation was provided").  It is clear from the administrative record, however, that the desk was provided in August 2005.  (See H89).

[7]These injections were not administered by Dr. Beckner but by another provider. Plaintiff also received an intra-articular steroid injection on August 9, 2006.  (H213-14).

Plaintiff saw Dr. Faber for a checkup on August 8, 2006. (H233). He noted that Plaintiff was "having joint pain complaints, as well as mood and affect disorder." (Id.). He also noted "traumatic arthritis of the neck, right shoulder, and both knees." (Id.). On that date, Dr. Faber wrote a note indicating that "current medical conditions require a 4 weeks [sic] medical leave of absence." (H234). On a Hartford "Attending Physician's Statement of Continued Disability" dated August 9, 2006, Dr. Faber indicated that Plaintiff suffered from Epstein-Barr virus, depression, and cervical disk disease, and he indicated her progress as of that date as "retrogressed." (H235).

On August 9, 2006, Hartford resubmitted disability forms to Dr. Beckner's office—apparently in response to a phone call from that office that morning—instructing, "Please complete the information that [you] would like us to consider" and return the forms. (H384). On August 11, 2006, Dr. Beckner faxed "updated forms for work hour and work restriction" of Plaintiff to Hartford. (H355). Included in these forms was the same form Dr. Beckner had signed just a few weeks earlier, this time with different restrictions—he released Plaintiff to work only six hours per day using the Sit/Stand Workstation. (H359). Dr. Beckner noted on that date that "patient has multitude of other diagnos[e]s–this is from a[n] orthopaedic standpoint, all other would defer to patient[']s other physicians." (H359). In other forms completed by Dr. Beckner dated August 10, 2006, Dr. Beckner reiterated Plaintiff's limitation of working only six hours per day.[8]

_____

[8]On a "Physical Capacities Evaluation Form," Dr. Beckner indicated that Plaintiff could sit, stand, and walk each a total of six hours per day, "with the ability to change positions every 5-10 minutes." (H219). In the "comments regarding patient's abilities and limitations" section of that form, Dr. Beckner stated in part: "Patient to work a 6 hr schedule, at

In an email to Hartford dated August 14, 2006, Plaintiff's supervisor, Doug Woulf, stated in part: "[Plaintiff] always looks tired and she says she is in varying degrees of pain or discomfort most of the time. She alternates sitting and standing at her workstation although she does not look comfortable at any time – always fidgeting and trying to find a more comfortable position. She looks and acts like someone who is always in pain and tired." (H372).

On August 15, 2006, Plaintiff was examined by Dr. Conaughty at the Spine and Brain Neurosurgery Center for an initial evaluation for neck pain and stiffness. (H248-49). Dr. Conaughty noted that Plaintiff had "a lot of issues with fatigue," and he recommended physical therapy for back core strengthening and followup in six weeks. (H248-49). Plaintiff began physical therapy on August 29, 2006. (H254-58). On October 10, 2006, Plaintiff was seen by a neurosurgeon, Dr. Razack, who indicated that Plaintiff "clearly has a 6-7

_____

workstation provided." (H220). Dr. Beckner indicated that these restrictions would be reassessed in November 2006. (Id.). And, in a Hartford Form titled "Attending Physician's Statement of Continued Disability," Dr. Beckner indicated Plaintiff's progress as "unchanged." (H215).

On another form, Dr. Beckner answered "no" when asked whether Plaintiff could work "full time (40 hours per week)." (H221). In explaining that answer, Dr. Beckner stated: "Back and neck pain causing diminishment in motion to cervical. Fusion L4-L5. Patient in process of cervical epidurals." (Id.). Dr. Beckner indicated work restrictions as: "Work [a] 6hr day with the ability to change positions every 10-15M." (Id.). When asked on that form when Plaintiff would be released to full-time work, Dr. Beckner responded: "Unknown at this time. Patient to continue with pain management and follow up appts. Will reevaluate 11/06." (H222). On a "Job Modification Request Form" and signed by Dr. Beckner on August 10, 2006, Dr. Beckner indicated that Plaintiff had chronic back and neck pain; that her condition affected her ability to perform her job in that she was not able to sit/stand for a prolonged period of time; and that his medical opinion of possible job modifications was that she should use a sit/stand work station, work no longer than a six-hour day, and be able to change positions every fifteen minutes. (H358).

-10-

radiculopathy on the right" and "needs an anterior cervical discectomy and fusion at C-5-6-7" but was reluctant to have the surgery. (H251). On December 5, 2006, Dr. Razack ordered physical therapy three times a week to improve Plaintiff's pain. (H253).

On September 21, 2006, Dr. Mark Harris, a chiropractor, indicated on a Hartford "Attending Physician's Statement of Continued Disability" form that he had diagnosed Plaintiff with a cervical disc protrusion and that he recommended that Plaintiff be "off work from 8-31-06 to 6 weeks from" September 21, 2006. (H261-62). Dr. Harris stated that "patient should not be working during this physical therapy and recovery period over next 6 weeks." (H262). On November 30, 2006, Dr. Harris reiterated that Plaintiff should be off work for six weeks from that date and that she should not be working during the physical therapy and recovery. (H265-66).

On October 13, 2006, an attorney wrote to Dr. Faber on Plaintiff's behalf, asking him "to assist [Plaintiff] with the paperwork she needs to perfect her disability claim," noting that Plaintiff "is in a situation where she has multiple issues where potentially each issue individually might not be sufficient for disability but a combination of all of those issues would be sufficient for her to be considered disabled under her insurance policy." (Letter from Kennon to Faber of 10/13/2006, H241-42). In response, Dr. Faber wrote that "with regard to the rheumatoid arthritis, [Plaintiff] does not have any features that would clearly and unequivocally render her disabled." (Letter from Faber to Kennon of 10/18/2006, H243-45, at H244). However, Dr. Faber then stated:

> The patient's current disability is clearly inherent in the problems related to her cervical spine. Although I am not a surgeon and cannot comment upon how completely successful

> cervical disc surgery would be, it is clear that without the surgery, [Plaintiff] is incapacitated and disabled for any and all activities within the scope of her professional training. Even sedentary activities that would require the repeated use of her upper extremities, such as working with a computer, would be extremely difficult for her to do.

(H244).

On January 12, 2007, Plaintiff sent a letter to Hartford formally appealing the termination of her LTD benefits. (H136-42). Hartford's corporate medical advisor, Edward Berman, M.D., reviewed Plaintiff's claim file and presented it at an Appeals Committee Meeting on February 1, 2007. (See H119-34). Dr. Berman found "no significant evidence to support disability beyond" July 16, 2006[9] (H133), and in a letter dated February 28, 2007, Hartford informed Plaintiff that her appeal had been denied based on Hartford's "finding that the medical evidence does not support that [she was] Disabled beyond July 16, 2006," (Appeal Denial Letter, H116-18).

After the denial of her appeal, Plaintiff continued to see doctors and to submit documentation to Hartford.[10] In May 2007, Plaintiff underwent surgery on her neck. The post-operation report for that surgery indicates "[o]ld fracture right C3-4." (H101). On August 30, 2007, Plaintiff's attorney sent a letter to Hartford asking Hartford to consider new medical evidence regarding "an old neck fracture" that was discovered during the May 2007

---

[9]Although Dr. Berman's report indicates the date as "7/16/07," this appears to be a clerical error; the correct year is 2006 rather than 2007. (See also Def.'s Mot., Doc. 33, at 14 & n.2 (noting Dr. Berman's error regarding the year)).

[10]The documents that Plaintiff submitted to Hartford after the denial of appeal are in the administrative record.

surgery and seeking for Hartford to reopen Plaintiff's claim "in light of this new evidence." (H97). On October 23, 2007, Hartford informed Plaintiff that "The Hartford's final appeal decision was made on February 28, 2007"; that the "decision was based on a complete and final administrative review"; that "the administrative remedies provided by ERISA and the Plan have been exhausted"; and that "[t]here are no provisions for additional appeals or reopening the administrative record after a final appeal determination has been made." (H91). On December 17, 2007, Plaintiff filed this lawsuit seeking review of Hartford's termination of her LTD benefits. (Doc. 1).

## II. Discussion

### A. ERISA Review Standards

As other judges in this district have aptly noted, "'[i]n an ERISA benefit denial case [subject to deferential review], . . . in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary.'" Crume v. Metro. Life Ins. Co., 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002), and collecting cases) (all but first alteration in original). "Accordingly, '[where] the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.'" Id. (quoting Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999)) (alteration in original); see also Gammell v. Prudential Ins. Co. of Am., 600 F. Supp. 2d 227, 237 (D.

Mass. 2008) ("Although summary judgment is ordinarily a procedural tool for screening out cases that do not present trialworthy issues, in ERISA actions it is 'simply a vehicle for deciding the issue.'" (quoting Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005))).

"'ERISA does not provide the standard to review decisions of a plan administrator or fiduciary.'" Shaw v. Conn. Gen. Life Ins. Co., 353 F.3d 1276, 1282 (11th Cir. 2003) (quoting Marecek v. BellSouth Telecomms., Inc., 49 F.3d 702, 705 (11th Cir. 1995)). However, case law establishes that the appropriate standard of review depends on whether the ERISA plan at issue affords discretion to the plan administrator. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). The Eleventh Circuit Court of Appeals has developed a step-by-step analysis to be applied in reviewing ERISA claims. Under this analysis, the first three steps a reviewing court is to follow are:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

Doyle v. Liberty Life Assur. Co. of Boston, 542 F.3d 1352, 1356 (11th Cir. 2008) (quoting Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004)).

In Williams, the Eleventh Circuit initially set forth a six-step analysis, employing three

standards: de novo; arbitrary and capricious when an administrator enjoys discretion under the plan; and "heightened" arbitrary and capricious where the administrator acts under a conflict of interest. However, in 2008 the Supreme Court decided <u>Metropolitan Life Insurance Co. v. Glenn</u>, 128 S. Ct. 2343 (2008), holding that a conflict of interest "should be weighed as a factor in determining whether there is an abuse of discretion" but does not change the *standard* of review. <u>Id.</u> at 2350 (internal quotation omitted).

Several months later, in <u>Doyle</u>, the Eleventh Circuit acknowledged that the "heightened arbitrary and capricious" standard no longer applies in conflict-of-interest situations. The <u>Doyle</u> court held, in accordance with <u>Glenn</u>, "that the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious" and that "while the reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." 542 F.3d at 1360.

In the instant case, it is undisputed that Hartford was both vested with discretion in reviewing claims and was acting under a conflict of interest because it both determines claims and pays benefits. (<u>See</u> Doc. 33 at 16). Thus, the first step is for this Court to assess whether Hartford's decision to terminate Plaintiff's LTD benefits was "wrong" under the de novo standard—that is, whether the Court disagrees with that decision. If so, the Court must then examine Hartford's decision under the arbitrary and capricious standard, taking into account Hartford's conflict of interest in making that examination. When the arbitrary and

capricious standard is applied, "'the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made.'" Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008) (quoting Jett v. Blue Cross & Blue Shield of Ala., 890 F.2d 1137, 1139 (11th Cir. 1989)).

B.  Application

Although I do not agree with several of Plaintiff's arguments for overturning Hartford's benefits determination, I do find, under the de novo standard, that Hartford's decision to terminate Plaintiff's LTD benefits as of July 17, 2006 was "wrong." In other words, I disagree with Hartford's decision.  Moreover, applying arbitrary and capricious review, I find that Hartford's decision was not reasonable.  After briefly addressing the arguments of Plaintiff with which I do not agree, I will turn to review of the benefit-termination decision.

As earlier noted, Plaintiff's LTD benefits were terminated in July 2006 and her appeal was denied on February 28, 2007.  In her appeal to this Court, Plaintiff argues that "she was suffering with an undiagnosed fractured cervical spine" that was allegedly discovered during neck surgery in May 2007.  (See Doc. 35 at 13, 16).  Plaintiff contends that evidence of this surgery and this fracture was presented to, but not considered by, Hartford or its reviewing physician, Dr. Berman.  (Id. at 16).  However, the May 2007 surgery occurred after Plaintiff's appeal had been denied by Hartford, and there is no way that Dr. Berman could have considered it in his February 1, 2007 review of Plaintiff's medical records.  Cf. Rittenhouse v. UnitedHealth Group Long Term Disability Ins. Plan, 476 F.3d 626, 631 (8th Cir. 2007) ("ERISA's administrative appeal process is not indefinite.  Once the claimant has had a 'full

and fair review,' the process is complete, and the administrator may close the record and issue a final decision."). Moreover, although Plaintiff opines that the fracture discovered during the May 2007 surgery occurred when she fell on some stairs in March 2006, there is no evidence as to when the fracture occurred. Plaintiff asserts that this previously-unknown neck fracture explains her discomfort in 2006, but this is speculation on her part. (See, e.g., Doc. 35 at 2 ("This cervical fracture is presumed to have occurred when [Plaintiff] fell down the stairs during her recovery in March 2006.")).[11] In any event, Hartford correctly notes that it is not a diagnosis or condition that determines entitlement to disability benefits; instead, it is the terms of the ERISA plan at issue that determine the standard of disability under that particular plan. See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 880 (9th Cir. 2004) (noting that the fact "[t]hat a person has a true medical diagnosis does not by itself establish disability" under an ERISA plan, explaining that "[m]edical treatises list medical conditions from amblyopia to zoolognia that do not necessarily prevent people from working"), abrogation on other grounds recognized by Montour v. Hartford Life & Accident Ins. Co., No. 08-55803, 2009 WL 2914516, at *6 (9th Cir. Sept. 14, 2009). Plaintiff's capabilities were determinable without a neck fracture diagnosis. Thus, Plaintiff's reliance on the neck fracture is misplaced, and the Court does not fault Hartford for not considering this later-acquired evidence.

Plaintiff also makes misplaced assertions regarding the essential duties of her job. She asserts that her job, as described by Hartford, was a sedentary job that required her to

---

[11]The neck fracture was not mentioned by any doctor who reviewed Plaintiff's April 13, 2006 MRI.

sit for seven hours per day, which she could not do. However, a "sedentary" job is generally the least taxing type of work that someone can perform, and "sitting" requirements often indicate the portion of the job in which sitting—typically the easiest of positions—is permitted, not necessarily how long one really "must" sit to do the job.[12] The fact that Plaintiff had difficulty sitting did not *per se* render her incapable of performing her job. Additionally, Plaintiff asserts that an "accommodated" position—i.e., her job with the sit/stand desk that Hartford provided her—should not be considered with regard to whether Plaintiff could perform the essential duties of her job. This contention is rejected. The Plan defines "essential duty" as "a duty that is . . . substantial, not incidental; . . . is fundamental or inherent to the occupation; and . . . can not be reasonably omitted or changed." (H9). Under this definition, even if "sitting" were an "essential" duty, which it is not, it could be reasonably omitted or changed with the sit/stand desk. Thus, Hartford acted properly in considering Plaintiff's functionality with the sit/stand desk rather than without it.

Although I reject the foregoing arguments of Plaintiff, I nevertheless conclude that Hartford's decision to terminate Plaintiff's LTD benefits was "wrong" under de novo review and "unreasonable" under arbitrary and capricious review. The evidence in the administrative record overwhelmingly reflects inability of Plaintiff to perform her job for eight hours a day, and there is no reasonable basis for Hartford's conclusion to the contrary.

In its letter denying Plaintiff's appeal, Hartford noted that its decision had been based

_____

[12]In 2005, Plaintiff's supervisor completed a "Physical Demands Analysis Form" regarding Plaintiff's job. (H605-06). The supervisor indicated that "[i]n an 8-hour workday, an individual in this job must" sit for seven hours, stand for half an hour, and walk for half an hour. (H605).

on review of all the documents in her claim file and consultation with its medical advisor, Dr. Berman. (H116). With regard to Dr. Beckner's opinion of Plaintiff's ability to work in July and August 2006, Hartford stated in that letter: "[O]n July 17, 2006, Dr. Beck[n]er indicated in his notes that you could 'return to work eight hours per day using your sit/stand workstation . . . .' On August 10, 2006, Dr. Beckner indicated that you were released to return to work six hours per day using your sit/stand workstation. It is unclear why Dr. Beckner modified your work restrictions to six hours per day when three weeks prior to that he released you to an eight hour day." (H117). Hartford further justified its denial of Plaintiff's appeal by noting that Plaintiff had worked between seven and nine hours per day in April and May 2006, "confirm[ing] that [Plaintiff was] able to work within [her restrictions]. (Id.). Hartford also noted records of other doctors but concluded that they did not support disability. (Id.).

In his report compiled after reviewing Plaintiff's file, Dr. Berman listed, in fourteen pages, items in Plaintiff's file that he reviewed, and he then gave a conclusion of just over a page summarizing his findings. (H119-34). In his conclusion, Dr. Berman noted Dr. Beckner's release of Plaintiff to work on July 17, 2006, but he did not even mention Dr. Beckner's assessment as of August 10, 2006. (H132-33).[13] Dr. Berman also noted in his conclusion Dr. Faber's opinion—stated in an October 2006 letter to Plaintiff's attorney—as to Plaintiff having a "10% total and permanent disability," but he discounts Dr. Faber's

---

[13]In the summary section of his report, Dr. Berman did mention that Dr. Beckner's office had completed additional forms on August 9, 2006, but the report states: "This was too little too late as her disability claim was denied." (H127).

qualifications and does not mention Dr. Faber's statement in that same letter that without surgery, Plaintiff is "incapacitated and disabled" due to problems with her cervical spine.[14]

I disagree with the conclusions in Dr. Berman's report and in Hartford's appeal denial letter. Although Plaintiff's surgeon, Dr. Beckner, did indicate on July 17, 2006—upon being informed by Hartford that Plaintiff had been provided with a sit/stand desk and being asked to check, on a Hartford-provided form, one of several choices regarding her functional capabilities—that she could work an eight-hour day (H201-02), that assertion involves a misunderstanding about the point at which the sit/stand desk was provided. Dr. Beckner's file notes from July 17, 2006 state in part: "Apparently, her employer has provided her with a sit-stand work station and a movable desk. With this provision, I think it would be fine for her to return to a job 8 hours a day but still avoid repetitive lifting or bending and have a 20 pound lift limit. This would be as of the providing of that work station, whatever date that might be." (H203).

However, the sit/stand workstation had been provided nearly a year earlier—in July 2005—even before Plaintiff's back surgery in November 2005. Dr. Beckner had mentioned the sit/stand workstation to Hartford in February 2006, a time at which he was still recommending that she stay out of work entirely due to problems sitting. (H64). Thus, his statement in July 2006 that she could return to work as of the date the sit/stand workstation was provided is flawed. Dr. Beckner apparently forgot that she had been provided with this sit/stand workstation the prior summer, and the change in his opinion upon being told of a

---

[14]Dr. Berman did mention this in his summary of the file (H130), but he does not make note of it all in his conclusion.

supposed new circumstance that actually already existed and was inherent in Plaintiff's workplace functioning is similarly flawed. Because Plaintiff had had the sit/stand desk available to her since she returned to work part-time in March 2006, her capabilities with that desk were already being evaluated by Dr. Beckner from that point forward, including when he adjusted his assessment in April 2006 upon finding that she tolerated a workday of six to seven hours per day better than full-time work.

Moreover, even without the problem of the mixup over the date of the provision of the sit/stand desk, Hartford's crediting of Dr. Beckner's July 17 response to its fax over Dr. Beckner's opinion on August 10, 2006 after actually seeing Plaintiff in his office on July 27 is, to say the least, problematic. On August 10, Beckner completed new forms—after Hartford faxed him new, blank forms on August 9—restricting Plaintiff to six hours of work per day and indicating that she could not work a full forty-hour week. (See, e.g., H221). In its appeal denial letter, Hartford stated, "[i]t is unclear why Dr. Beckner modified your work restrictions to six hours per day when three weeks prior to that he released you to an eight hour day." (H117). However, Dr. Beckner did explain on August 10 that Plaintiff was experiencing back and neck pain and was undergoing epidural injections, (H221), and Hartford does not give any explanation for why it chose to credit Dr. Beckner's July 17 opinion—given in response to a pointed question from Hartford and without evaluating Plaintiff at that time—rather than Beckner's opinion just a few weeks later after he had actually observed Plaintiff on July 27. (See H362 (noting "most recent treatment" date of July 27, 2006)). Similarly, Dr. Berman did not explain why he credited Dr. Beckner's July 17, 2006 assessment over Dr. Beckner's August 2006 assessment; indeed, in his conclusion

section he did not mention that August 10 assessment at all.  Additionally, Dr. Berman

mentions, in his summary of records reviewed, the opinion of Plaintiff's chiropractor, Dr.

Harris, that from August to 2006 to January 2007 Plaintiff "should not be working" during

physical therapy and recovery for her neck pain (H129), but in his conclusion section he

makes no mention of Dr. Harris whatsoever.  He also mentioned in his summary the

statement of Dr. Faber, an internist, in a letter to Plaintiff's attorney in October 2006, that with

regard to Plaintiff's neck, without surgery she is incapacitated (H130), but in his conclusion

he questions Dr. Faber's willingness to give an opinion in October 2006 because Dr. Faber

would not get involved with the disability paperwork in July 2006 but instead deferred to Dr.

Beckner (H133).

Hartford notes case law providing that an insurer is not required to credit the changed

opinion of a treating doctor, especially where the change in opinion occurs after a termination

of benefits,[15] and that "[e]ven a self-interested fiduciary is entitled to choose an apparently

more reliable source of information when sources conflict."[16]  However, in the instant case

the opinions that Hartford discounted are more reliable than the opinions that it credited, and

thus the evidence relied upon by Hartford is not "apparently more reliable."

In its motion, Hartford asserts that (1) Dr. Beckner's July opinion upon being told by

Hartford of the sit/stand workstation, (2) confirmation from Plaintiff's boss that the sit/stand

---

[15]See, e.g., Gooden v. Provident Life & Accident Insur. Co., 250 F.3d 329, 334 (5th Cir. 2001); Brigham v. Sun Life of Canada, 317 F.3d 72, 84 (1st Cir. 2003).

[16]Brown v. Blue Cross & Blue Shield of Ala., Inc., 898 F.2d 1556, 1572 (11th Cir. 1990).

workstation had in fact been provided, and (3) Dr. Berman's review of the file are more reliable than (1) Dr. Beckner's "modified" opinion issued in August 2006, (2) Dr. Faber's October 2006 letter, and (3) Plaintiff's subjective complaints. (See Doc. 33 at 18). However, Dr. Beckner's July 17, 2006 release to work was given in response to a pointed inquiry after being told that Plaintiff had been provided a sit/stand workstation. Dr. Beckner did not see Plaintiff on that date, nor did he speak with her. In contrast, Plaintiff had an office visit with Dr. Beckner on July 27, and thereafter he revised her work capability to six hours per day. In light of the fact that the sit/stand workstation had been in place for nearly a year in July 2006 and thus was already inherent in Plaintiff's workplace functionality, Dr. Beckner's change in assessment based on this supposed new fact is not reliable. In any event, it is certainly not more reliable than an assessment based on an in-office evaluation of Plaintiff.

Furthermore, there is much more evidence in the administrative record supporting a finding of disability than the three items listed by Hartford as evidence contrary to the evidence that it chose to rely on. Plaintiff's claim file is replete with evidence that Plaintiff's condition in July and August 2006 was worsening or at best, had not changed. (See, e.g., H235 (Dr. Faber's indication of "retrogressed"); H215 ("Dr. Beckner's indication of "unchanged")). The overwhelming evidence in the administrative record indicates that despite Plaintiff's continued efforts to return to work despite extensively documented neck and back pain, among other problems, she was unable to work a full eight-hour day as of July and August 2006 and beyond. This assessment was shared by her boss, who worked for Hartford itself and who telephoned to report Plaintiff's obvious pain and discomfort when trying to work a full day. The evidence reflects doctors' notes advising Plaintiff to remain out

of work to get treatment and recovery for her neck all the way to the time she submitted her appeal in 2007. Hartford's assessment of Plaintiff's file was incomplete, selective, and unreasonable. Cf. Byrom v. Delta Family Care–Disability and Survivorship Plan, 343 F. Supp. 2d 1163, 1185 (N.D. Ga. 2004) ("To hold otherwise would be to say that under the arbitrary and capricious standard of review, a plan administrator may point to any piece of evidence, no matter how weak in the context of the total administrative record, to support a denial of benefits."); Kinser v. Plans Admin. Comm. of Citgroup, Inc., 488 F. Supp. 2d 1369, 1383 (M.D. Ga. 2007) ("Such a selective review of the evidence and reliance on a cold record file review by a non-examining doctor establishes that [the insurer's] decision was not made 'rationally and in good faith' and is therefore unreasonable."). The termination of Plaintiff's LTD benefits must be reversed.

Plaintiff requests an award of benefits from July 17, 2006 to the date of the filing of this lawsuit—December 17, 2007. (See Doc. 33 at 22). However, the Court is in doubt as to the proper amount to be awarded and the proper language to be included in a judgment for Plaintiff. Thus, further briefing on these issues is ordered below.

III. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant, Hartford Insurance Company's, Dispositive Motion for Summary Judgment (Doc. 33) is **DENIED**.

2. Plaintiff's Dispositive Motion for Summary Judgment (Doc. 35) is **GRANTED**.

3. **On or before Monday, October 19, 2009**, each party shall submit a memorandum of **eight (8) pages or fewer** regarding the amount of benefits to be awarded to Plaintiff and

regarding whether remand to Hartford for further proceedings consistent with this Order is necessary or appropriate. The parties shall address, inter alia, whether it is appropriate for this Court to award benefits beyond the date of the appeal denial and whether any amount awarded by this Court should be offset by any other payments—for example, Social Security Disability payments—Plaintiff receives. The parties are encouraged to confer in an attempt to reach an agreement regarding the appropriate award and regarding language to be included in the judgment. If the parties are able to resolve this matter on their own, they shall notify the Court immediately.

**DONE** and **ORDERED** in Orlando, Florida this 29th day of September, 2009.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party